```
               IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES WILLIAMS                    :     CIVIL ACTION
                                  :
          v.                      :
                                  :
THE KINTOCK GROUP, INC.           :     NO. 20-1915
```

<u>MEMORANDUM</u>

Bartle, J.                                        August  2, 2022

      Plaintiff James Williams brings this action against defendant The Kintock Group, Inc. under 42 U.S.C. § 1983 for violation of the Eighth and Fourteenth Amendments to the Constitution.  Defendant owns and controls the Kintock House, a halfway house where plaintiff was committed for a parole violation.  Plaintiff also brings state law claims for medical malpractice, intentional infliction of emotional distress, and negligence.  Before the court is the motion of defendant for summary judgment.

I

      Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  A dispute is genuine if the evidence is such that a

reasonable factfinder could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).  We view the facts and draw all inferences in favor of the nonmoving party.  See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Summary judgment is granted when there is insufficient record evidence for a reasonable factfinder to find for the nonmovant.  See Anderson, 477 U.S. at 252.  "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]."  Id.  In addition, Rule 56(e)(2) provides "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion."  Fed. R. Civ. P. 56(e)(2).

II

The facts are set forth in the light most favorable to plaintiff, the nonmoving party.

Defendant contracts with the Pennsylvania Department of Corrections and the Federal Bureau of Prisons to run a halfway house called the Kintock House on Erie Avenue in Philadelphia.  Defendant is accredited by the American Correctional Association and the Prison Rape Elimination Act.

The Kintock House is a single-floor building in an old warehouse which includes dormitories, a gymnasium, cafeteria, kitchen, and offices. It has a capacity of 392 residents with two dormitories that are large rooms like a school gymnasium. Plaintiff was in the section where you can only leave to eat in the cafeteria down the hall or to go to the counselor's office in between. In the other dormitory there is more freedom to move around.

Plaintiff was admitted to the Kintock House on or about May 7, 2018 and released on or about July 12, 2018. He was a part of the Parole Violators Program of the Pennsylvania Department of Corrections for a technical violation for failing to report his address. This program typically provides for stays of sixty to ninety days.

According to Gretchen Wiseman, the Chief Administrative Officer for defendant, defendant is supposed to conduct a medical, dental, and mental health screening upon a resident's arrival to the facility unless the resident is coming from prison, and a full medical examination within fourteen days of arrival. Nicola Cucinotta, who monitors compliance for defendant, testified that unimpeded access to healthcare is required, which includes screenings for new arrivals. She did not recall if plaintiff had a medical screening when he arrived.

At the time that plaintiff was admitted in May 2018, defendant was in the midst of taking over medical services from Corizon Healthcare. The contract with Corizon ended on May 2, 2018. Defendant employed licensed practical nurses ("LPNs") who worked on site and reported to site administrators. On May 7, 2018, Mecca Taylor started working as an LPN for defendant at the Erie Avenue location. Another LPN, Requitta Bellinger, began working part-time on June 4, 2018. In addition, defendant independently contracted with nurse practitioners to come in a few hours a week. Bellinger could not recall if a nurse practitioner visited the site in June 2018. No doctor was regularly on site.

Defendant had a contract with Dr. Eke Kalu to act as its medical director to oversee the nursing staff in a limited capacity. He simply had responsibility for staffing nurses and for reviewing policy procedures. Dr. Kalu also is the medical director responsible for overseeing the entirety of the Philadelphia Prison Systems. While he visited the Kintock House when needed, neither he nor any other medical doctor, except as noted below, provided any medical care or saw any patients. Instead, the nurse practitioner contractors and LPN employees were responsible for patient medical services. Dr. Kalu simply performed an administrative role and was not involved in the day-to-day activities of the site.

4

Defendant did employ a psychiatrist at the time, Dr. Hani Zaki, who visited the Kintock House when needed.  The LPNs on site would provide Dr. Zaki with a list of residents who needed his assessment.  Dr. Zaki did not himself review any records to evaluate who needed psychiatric services.

Neither a doctor nor a nurse practitioner reviewed a resident's incident reports or sick call requests.  Instead, the non-medical case administrator and non-medical supervisor did so.  If a resident needed to see a doctor, he had to go first to his case manager who would coordinate the request with the supervisor and the resident's parole agent.  No medical professional reviewed these requests.  Sick call requests were kept in the resident's medical chart.

If a resident was having a medical emergency, the case manager would call the resident's parole agent or the Department of Corrections to obtain permission to take the resident to a hospital.  The program director at the Kintock House, who at the time of plaintiff's commitment was Frank Guyon, determined whether the situation warranted a call to the parole agent or to the Department of Corrections.  When a resident was taken to the hospital, the event was not necessarily documented in the resident's medical chart.  The event instead would be noted in defendant's operations logbooks and incident reports.

Staff at the Kintock House administered medication to residents with prescriptions.  Most of the residents had medication already prescribed by an outside doctor.  The contracted nurse practitioner was able to issue prescriptions.

It was defendant's policy that the residents had the responsibility to go to the nurses' station to obtain their medication when they needed it.  Cucinotta, who completed audit checks of the medication to ensure that all pills were accounted for, testified that the Kintock Group State Reentry Handbook that all residents received upon arrival informed residents that they can retrieve their medication several times a day.  The staff at the Kintock House did not track the schedules for medication for the residents or remind them when they were to take it.

Plaintiff was at defendant's facility on Erie Avenue for two and a half months.  During that time he was not allowed to leave the facility without permission.  Plaintiff had previously been diagnosed with Graves disease, post-traumatic stress disorder, paranoid schizophrenia, bipolar, and diabetes.  While at the Kintock House he had prescriptions for Prozac for depression, Risperdal for suicidal thoughts, Lisinopril for mood swings and depression, blood pressure medication, and Metformin and insulin for diabetes.  These medications had been prescribed

by physicians at Mary Howard Health Center and physicians through Project Home.

When plaintiff entered defendant's facility, defendant received a list of plaintiff's medications.  Plaintiff asserts, however, that he did not receive any medication for the first three to four weeks he was there, after which he received his medication every day.  On May 15, 2018, plaintiff fainted while going to the bathroom and was awakened by a staff member after passing out.  He severely injured his knee in this fall.  The knee continued to give him persistent and intense pain.  Alan Higgins, a fellow resident, testified to hearing plaintiff moan in pain throughout the night.  He testified that plaintiff's "leg looked like a basketball."

Plaintiff complained on numerous occasions throughout May 2018 about needing to go to the hospital after his fall and about not receiving his medication as prescribed.  On one particular occasion, plaintiff submitted a grievance form stating that he had not received any medication since he was admitted and that his body has "been locking up on me."  He also specifically asked to see the psychiatrist.

He never saw a doctor about these concerns and never was taken to the hospital about his knee after his fall.  A nurse at the facility simply provided him with a walker and ice.

Plaintiff also had appointments at the Mary Howard Health Center and at Project Home that were scheduled before he was committed to the Kintock House. Plaintiff was not taken to his appointments on May 18, 2018 at Mary Howard Health Center or on June 6, 2018 at Project Home. Plaintiff raised the issue of these appointments on sick call request forms in May and June.

Once he was released from the Kintock House on or about July 12, 2018, plaintiff went to Temple Hospital at two locations, one of which informed him that his knee was broken. He was put on crutches and finally saw an orthopedist.

### III

To establish a claim under § 1983, plaintiff must demonstrate that a person acting under the color of state law violated his rights protected by the Constitution. 42 U.S.C. § 1983; see Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 580-81 (3d Cir. 2003). A private entity is considered a state actor under § 1983 when its actions can be "fairly attributed to the state itself." Groman v. Twp. of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995). The parties do not dispute that defendant, which contracts with the Pennsylvania Department of Corrections and the Federal Bureau of Prisons to run a halfway house, is a state actor for purposes of this action. See Natale, 318 F.3d at 581.

Plaintiff brings his claims in Counts I and II under § 1983 for violation of his rights under the Eighth Amendment to the Constitution for cruel and unusual punishment and the Fourteenth Amendment for violation of due process, respectively. If his claims are prior to conviction, then they are evaluated under the due process clause of the Fourteenth Amendment. Id. at 581. Plaintiff, however, was already convicted and was confined to defendant's facility for a parole violation where he was not at liberty to come and go freely and where he was completely dependent on defendant for all of his basic needs. See e.g., Giddings v. Joseph Coleman Ctr., 473 F. Supp. 2d 617, 623 (E.D. Pa. 2007). His status therefore was akin to that of a convicted person under incarceration. Thus, he was protected from cruel and unusual punishment by the Eighth Amendment while at defendant's facility. Id. He has no claim under the Fourteenth Amendment.

In cases regarding inadequate medical care, the Supreme Court has found that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under [§] 1983." Id. Negligence or medical malpractice alone

9

are not constitutional violations simply because the victim is a prisoner.  Id. at 106.  Rather the plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Id.

Thus, to establish a violation of a plaintiff's constitutional rights, the "evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  Natale, 318 F.3d at 582.  "Deliberate indifference is a 'subjective standard of liability consistent with recklessness as that term is defined in criminal law.'"  Id.  Officials must know of and disregard an excessive health or safety risk.  Id.  "To survive a summary judgment motion on this issue, [a plaintiff] 'must point to some evidence beyond [his] raw claim that [defendants] were deliberately indifferent,'" or that defendants knew of or were aware of the risk to the plaintiff.  Id.  Deliberate indifference includes situations where "there was 'objective evidence that [a] plaintiff had serious need for medical care,' and prison officials ignored that evidence" or when "necessary medical treatment is delayed for non-medical reasons."  Id.

IV

Plaintiff has not sued any individual employees of defendant under § 1983.  He has sued only The Kintock Group, Inc., of which the Kintock House is a part.  Defendant seeks

10

summary judgment on the ground that there is no respondeat superior liability and that plaintiff has failed to identify any policy or custom of it that caused a violation of plaintiff's constitutional rights.

Defendant is correct that there is no respondeat superior liability under § 1983. See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978). Consequently, a municipality or other state actor such as defendant here cannot be held responsible for "an injury inflicted solely by its employees or agents." Id. at 694.

A municipality, or private entity in the role of a state actor such as defendant, may nonetheless be held liable under 42 U.S.C. § 1983 when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Id. at 690-91. A custom of such an entity is also a basis for a suit under § 1983 if plaintiff proves "the existence of a widespread practice that, although not authorized by written law or express . . . policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970)).

11

In Natale v. Camden County Correctional Facility, our Court of Appeals discussed when for § 1983 purposes the acts or omissions of an entity's employees can be attributed to the entity itself. 318 F.3d at 584. It explained that a policy or custom exists when

> the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'

Id. In addition, the entity may be held liable where there is evidence that it "turned a blind to an obviously inadequate practice that was likely to result in the violation of constitutional rights." Id.

It is clear from the record that there is evidence of plaintiff's serious medical needs. He has been diagnosed with post-traumatic stress disorder, schizophrenia, and diabetes, among other diagnoses. He needed a variety of critical medication to aid with his mood swings and depression. He also was on insulin at the time for his diabetes. Furthermore, plaintiff repeatedly complained about injuries from a fall he sustained when he passed out but was not taken to the hospital even though his leg looked "like a basketball." Plaintiff described his body as "locking up on" him because he was not

12

receiving his medication. In addition, defendant failed to take plaintiff to his previously scheduled medical appointments.

Plaintiff points to several policies that evidence acts or omissions that indicate deliberate indifference. First, there is evidence defendant did not provide plaintiff with the necessary medical screening upon arrival.

Second, there is evidence that defendant did not have procedures in place to deal with grievances about the lack of medical care and failure to provide much needed medication.

Third, it was defendant's policy not to provide the services of a medical doctor to the residents at Kintock House when needed.

Finally, it was defendant's policy to have non-medical personnel review any grievances, sick requests, or requests for medical services in the first instance rather than the contracted nurse practitioner or any medical doctor.

There is enough evidence for a reasonable jury to find that defendant's failure to establish sufficient policies for medical care at its facility created a serious risk to residents such as plaintiff that is "sufficiently obvious as to constitute deliberate indifference to [residents'] medical needs." Id. at 585. There is evidence that defendant "turned a blind eye to an obviously inadequate practice," that is, the procedure for providing medical services and medication to residents, "that

13

was likely to result in the violation of constitutional rights." Id. at 584.  A reasonable jury could also infer that the failure to establish a more responsive policy to screen residents and provide them with the necessary medication upon arrival caused the specific violations of which plaintiff complains.  See id. at 585.

The motion of defendant for summary judgment as to plaintiff's Eighth Amendment claim under § 1983 in Count I will therefore be denied.  As plaintiff's claim will proceed under the Eighth Amendment, the court will grant summary judgment in favor of defendant and against plaintiff as to plaintiff's Fourteenth Amendment claim in Count II.

V

Defendant also seeks summary judgment on plaintiff's claim for medical malpractice and negligence in Count III.  Defendant argues that summary judgment is proper because plaintiff has failed to produce an expert to establish the appropriate standard of care and how defendant deviated from that standard.  On a medical malpractice claim, a plaintiff must establish:

> (1) a duty owed by the physician to the patient (2) a breach of duty from the physician to the patient (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and

>    (4) damages suffered by the patient that
>    were a direct result of that harm.

Mitzelfelt v. Kamrin, 584 A.2d 888, 891 (Pa. 1990). If "the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of ordinary experience and comprehension of even non-professional persons" then an expert is not required in a malpractice action. Brannan v. Lankenau Hosp., 417 A.2d 196, 201 (Pa. 1980).

The court finds that this case is one in which the exception to the expert requirement applies. Plaintiff asserts that he was not given his medication upon admittance to the Kintock House for at least three weeks and that he was not provided medical care despite his knee swelling up after his fall. These assertions are ones which a reasonable jury can evaluate within the range of ordinary experience and comprehension without expert testimony. See Natale, 318 F.3d at 579-80. The motion of defendant for summary judgment on Count III will therefore be denied.

## VI

Defendant also moves for summary judgment on plaintiff's claim in Count IV for intentional infliction of emotional distress. In Pennsylvania, this claim requires that the conduct of defendant be extreme and outrageous and that the conduct be intentional or reckless so that it causes severe

emotional distress.  Bruffett v. Warner Commc'ns, Inc., 692 F.2d 910, 914 (3d Cir. 1982).  The Pennsylvania Supreme Court cited to the Restatement (Second) of Torts to explain that "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Kazatsky v. King David Mem'l Park, Inc., 527 A.2d 988, 991 (Pa. 1987) (quoting Restatement (Second) of Torts § 46).  The Court has instructed that recovery for this tort is "highly circumscribed."  Id.  It requires "some objective proof of severe emotional distress" so that a claim of emotional distress is "supported by competent medical evidence."  Id. at 995.

Plaintiff clearly has evidence of pain and suffering, but that is not sufficient.  Plaintiff does not provide any objective proof or competent medical evidence for his claim that he suffered severe emotional distress as the result of defendant's conduct in failing to treat him for his leg injury. See id. at 992.  While the court does not minimize his claims, he has not come forward with that high quantum of proof that he suffered severe emotional distress to the degree required under Pennsylvania law.  Pennsylvania courts have been "chary to declare conduct 'outrageous' so as to permit recovery.'" Clark v. Twp. of Falls, 890 F.2d 611, 623 (3d Cir. 1989).

The Pennsylvania Supreme Court has declined to find a basis for this tort in the absence of objective proof of severe emotional distress, even in a case of grieving parents of infant twins who allege that the cemetery where their twins were buried threatened them to coerce further payments to maintain the graves.  See Kazatsky, 527 A.2d at 197.  Courts have also declined to find liability under Pennsylvania law for intentional infliction of emotional distress in matters where there is extensive evidence of a sexually hostile work environment, see Hoy v. Angelone, 691 A.2d 476 (Pa. Super. Ct. 1997), or when a police chief and township supervisor took actions that the court found to be "deplorable" in publicly disparaging a dissenting officer and ensuring he was investigated by the district attorney, see Clark, 890 F.2d at 624.  As the burden for this tort is "highly circumscribed" and in the absence of objective medical proof of severe emotional distress, the court will grant summary judgment in favor of defendant and against plaintiff on Count IV for intentional infliction of emotional distress.

VII

Finally, defendant seeks summary judgment on plaintiff's claim for negligence in Count V.  Defendant's only argument is that plaintiff cannot establish that there was any act or failure to act on defendant's part that was the cause of

plaintiff's injuries. A negligence claim requires a duty or obligation to conform to a certain standard of conduct, a breach of that duty, a causal connection between the conduct and the resulting injury, and actual loss or damage to the plaintiff. R.W. v. Manzek, 888 A.2d 740, 746 (Pa. 2005).

Defendant runs an accredited facility that is required to provide a standard of care including an "unimpeded access to healthcare." Plaintiff points to sufficient evidence that defendant breached that duty when it failed to screen him for his medical needs, provide his medication for weeks after his arrival, and evaluate his knee injury. Plaintiff claims he injured his knee after passing out and falling down. This is consistent with his complaints of his body "locking up" from a lack of medication. There is sufficient evidence for a jury to find that defendant acted negligently in not providing plaintiff with his medication or medical care. Accordingly, the court will deny summary judgment on Count V of the complaint for negligence.